*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JESSICA MICHELLE ENGLEBRECHT,

Defendant-Appellant.

FOR PUBLICATION
November 19, 2025
12:51 PM

No. 370317
Mason Circuit Court
LC No. 2021-003871-FH

Before: RICK, P.J., and O'BRIEN and MALDONADO, JJ.

RICK, P.J.

Defendant appeals as of right her jury trial convictions of eight counts of embezzlement from a vulnerable adult in the amount of $1,000 or more but less than $20,000 (embezzlement of $1,000 to $20,000), MCL 750.174a(4)(a); one count of embezzlement from a vulnerable adult in the amount of less than $200 (embezzlement of less than $200), MCL 750.174a(2); one count of embezzlement from a vulnerable adult in the amount of $200 or more but less than $1,000 (embezzlement of $200 to $1,000), MCL 750.174a(3)(a); and one count of commingling of funds by a caregiver, MCL 750.145p(1). Defendant was sentenced to concurrent terms of 23 months to 5 years' imprisonment for each of the eight counts of embezzlement of $1,000 to $20,000, two days' imprisonment for both the embezzlement of less than $200 and the embezzlement of $200 to $1,000 convictions, with credit for time served, and a consecutive term of 1 to 2 years' imprisonment for the commingling of funds conviction. We affirm.

## I. FACTUAL BACKGROUND

This action arises from the embezzlement of funds from defendant's clients: Wilma Pipher, Michael Witkowski, Margaret Stamp, David Sultz, Barbara Bailey, Ronald Kaszubowski, Henry Wirt, Joanne Urban, Yolanda Sanders, and Orval Vanas (collectively, the wards). Defendant served as a legal guardian, and in some cases also conservator, for the wards. She had the duty and authority to manage the wards' money, pay their bills, and track their expenses. According to the prosecution, while defendant was serving in these capacities for the wards, she began taking money from them and placing it in her personal bank account. This led the prosecution to charge her with eight counts of embezzlement of $1,000 to $20,000, and additional counts of

embezzlement of less than $200, embezzlement of $200 to $1,000, and commingling of funds by a caregiver.

At trial, Heather Hockanson testified that she was an Adult Protective Services (APS) worker for the Department of Health and Human Services (DHHS) when concerns regarding defendant's conduct came to light. Hockanson was initially assigned to investigate reports of vulnerable adult abuse relating to Wilma Pipher and Michael Witkowski in April 2019. Both wards resided at Krystal Manor, an adult foster care (AFC) for individuals whose physical or mental limitations made it impossible for them to live independently. Pipher told Hockanson that she believed defendant was her legal guardian, but that she was not completely sure. Pipher also told Hockanson that she had a car, which she believed was being stored in a barn in Newaygo County. Hockanson's investigation uncovered that defendant was driving Pipher's car without her knowledge or consent. Witkowski reported to Hockanson that he was not receiving receipts for purchases from defendant, despite asking for them. Witkowski told Hockanson that he did not know where all of his money was at that point.

Hockanson called in an official complaint to a DHHS supervisor. Thereafter, the matter was assigned to Michigan State Police Sergeant Kelsey Case. Hockanson and Case obtained an order from the Mason County Probate Court that allowed them to go through Pipher's and Witkowski's financial records. An investigation of their respective bank statements revealed that the withdrawals from their accounts exceeded their expenses. Further investigation increased Hockanson's concern that defendant was embezzling money. For example, Hockanson explained:

> [Witkowski]'s previous guardian passed away. At that time [Witkowski] had a bank account at West Shore Bank here in Ludington. He had approximately $2,000.00 dollars in his account. [Defendant] took over as guardian. And she removed that $2,000.00 dollars from West Shore Bank, but she did not deposit it into a new account that she had created at Safe Harbor [Bank]. So where was that $2,000.00 dollars? She didn't buy anything for [Witkowski]. There were no large purchases for [Witkowski]. So, the money is gone.

Hockanson likewise testified that defendant took more than $2,000 from Pipher's account and transferred it to her own personal bank account.

Hockanson went back to the probate court and obtained an order allowing her to investigate the financial records of defendant's remaining eight clients. Hockanson next investigated Ronald Kaszubowski and Barbara Bailey. Hockanson's investigation revealed a number of suspicious withdrawals from Kaszubowski's and Bailey's accounts. Similar concerns arose regarding Yolanda Sanders and Margaret Stamp. Sanders explained that she was not receiving her monthly spending allowance from defendant. Likewise, Stamp informed Hockanson that she had tried to contact defendant repeatedly, and defendant either wouldn't respond or would hang up on her. Hockanson's review of both wards' financial records indicated that they were missing money from their bank accounts.

The pattern continued with David Sultz and Joanne Urban. Sultz's financial records showed suspicious withdrawals that exceeded his expenses or were not explained. Urban, a nursing home resident, did not have enough money in her account to cover her medical expenses.

Hockanson testified that this was unusual, and explained that nursing homes typically use a client's Social Security funds to pay for their medical expenses. A review of Urban's bank account indicated that defendant had withdrawn $1,854 from the account, which remained unaccounted for.

Hockanson also met with Orval Vanas, who told Hockanson that he was not getting his monthly spending allowance of $100 from defendant. His bank account also showed suspicious and unexplained withdrawals. The same was true of Henry Wirt, whose financial records indicated that $3,000 had been withdrawn from his account and was missing. When Hockanson asked defendant about Wirt's money, she reported that she removed the money from Wirt's account so that he would remain eligible for Medicaid, an illegal practice that Hockanson explained was "called divestment, which means removing money from one source to another to either remain eligible for benefits or become eligible for benefits."

During the investigation, Hockanson spoke to defendant and asked to see her client records. Hockanson explained:

> We talked to [defendant]—we asked her to look at her files, her records. So, a guardian should have a pretty extensive record for each ward or each client to know what their expenses are and what's being paid, medical bills, pharmacy bills, things like that. They should have a record for each person. We asked to see that. [Defendant] had—what I observed was I believe it was like a white plastic sort of bin with plastic drawers like a Rubbermaid sort of thing. And it was a mess. Nothing was organized. And [defendant] reported that her true filing system, her filing cabinet, was in the state of Indiana.

Hockanson asked for access to the files located in Indiana, but defendant never gave them to her. When Hockanson asked defendant about the money missing from the wards, defendant explained that she would withdraw money from each of the wards' accounts, place it in her personal bank account, and pay the wards' expenses from there. Hockanson testified that defendant often paid for the wards' expenses using cashier's checks or cash, which made it even more difficult to keep track of expenses. When asked about this practice, defendant explained that she put the wards' money and receipts in a bank bag, which she alleged had been stolen. Hockanson stated that when defendant was interviewed about the bank bag, her estimate of how much money was in the bag was inconsistent.

Several AFC and nursing home personnel testified that defendant was generally difficult to reach by phone, failed to consistently ensure that the wards' health insurance and Social Security payments were in order, rarely visited the wards, rarely gave them spending money, and often did not pay the wards' rent on time.

Judge Jeffrey Nellis of the Mason County Probate Court testified that he was responsible for appointing guardians and conservators, overseeing their performance, and ensuring the protection of wards. Judge Nellis stated that he appointed defendant as guardian for the wards after she expressed interest in the position and demonstrated relevant experience through work at her mother's AFC facility. He noted that defendant's caseload of 10 or 11 wards was considered average in the field. However, Judge Nellis reported that defendant failed to timely file required

documentation, resulting in deficiency notices, a show cause hearing, and ultimately her removal from all of her cases. He also noted that he was concerned about defendant's use of Pipher's car and had ordered APS to investigate it. He confirmed that after the issue was investigated and it was determined that defendant should not have the car, he had his staff meet with defendant and take the car from her. Due to continued concerns about her behavior, Judge Nellis removed defendant from her cases and stated that she was not considered for future guardianship appointments.

Christi Huizenga testified that she was a public guardian and conservator with 24 years of experience and approximately 55 clients. She testified about proper guardian and conservator practices, which included maintaining separate bank accounts for each client, writing checks rather than using cash to create paper trails, never mixing client funds with personal funds, and filing required annual reports with the probate court. Huizenga also testified that she became Margaret Stamp's guardian and conservator in August 2019, after the death of Stamp's previous guardian and conservator, who had in turn replaced defendant. She stated that, when reviewing Stamp's finances from defendant's time as guardian and conservator, she found approximately $1,900 missing with no accounting of where it went. Huizenga also noted that when she took over as Stamp's guardian and conservator, Stamp had a large pharmacy bill still outstanding from defendant's time as her guardian and conservator. Huizenga further testified that legal guardians had a duty to visit their wards a minimum of once every three months.

John Thommen testified that he is the former guardian and conservator for Michael Witkowski. He stated that he took over the position from defendant. Thommen further stated that, after he became Witkowski's guardian and conservator, he found approximately $2,400 missing from Witkowski's bank account. Thommen was not sure where the money went. He testified that he had never put Witkowski's money in his own bank account. Thommen additionally stated that he used checks and debit cards rather than cash to maintain clear records of client-related transactions. He also testified that after he became guardian and conservator, Witkowski's financial situation improved significantly, despite no change in income.

Raykel Price testified that she had been a guardian and conservator for 11 years and had approximately 30 clients. She stated that she took over guardianship of Orval Vanas, Ronald Kaszubowski, Henry Wirt, and Joanne Urban from defendant. She testified she did not receive final accountings from defendant when she took over these four guardianships. Price additionally stated that she maintains separate accounts for each ward and keeps detailed files with all records. She further testified that she pays her wards' rent by check and provides spending money by check to create receipts and maintain records.

Lena Bluestein testified that she took over as guardian and conservator for Wilma Pipher and Yolanda Sanders after defendant's removal. She stated that when she took over Pipher's case from defendant, she was responsible for selling Pipher's car. She described the car as very dirty, with evidence of animals and children having ridden in it, and stated that it required significant cleaning before sale. Bluestein sold the car for $940 and deposited the proceeds into Pipher's account. Bluestein also reported that Pipher had several unpaid bills when she took over the guardianship. She confirmed that all bills and fees are reported in annual accountings to the court.

Sergeant Case testified that she first interviewed defendant in May 2019. She explained that, during the conversation, defendant repeatedly contradicted herself. Sergeant Case further indicated that defendant admitted she never asked Pipher for permission to drive her car, but that she did so anyway, and had in fact driven the car to the interview that day. Sergeant Case further testified that her investigation indicated that defendant had placed her name on the title to Pipher's car. Defendant indicated on documentation submitted to the Secretary of State that she paid Pipher $600 for the car, but never actually did so.

Sergeant Case also noted that defendant admitted she had not paid for her wards' pharmacy bills and had failed to sign a number of documents requiring her signature. During the interview, Sergeant Case asked about the money defendant took from Henry Wirt, which defendant claimed she took in order to ensure that he would remain eligible for Medicaid. At one point she stated that the amount was $3,000, but that number did not remain consistent throughout the investigation; defendant had stated on a prior occasion that the amount taken from Wirt was $2,500. Defendant stated that she placed the money, a number of receipts, and bank withdrawal statements in a bank bag, which was later stolen.

Sergeant Case also asked defendant about two $386 withdrawals from Pipher's account. Sergeant Case indicated that her review of defendant's and Pipher's bank accounts showed that the money was taken from Pipher and then apparently disappeared. Defendant merely stated that she took $386 out of the account so that she could get Pipher's car detailed before she began driving it for personal use. Sergeant Case also asked defendant about several other large withdrawals from Pipher's account, including one for $479, which defendant stated was for wardrobe shopping. Sergeant Case testified that she had seen Pipher's wardrobe and noted that none of her clothing looked like it amounted to $479.

Sergeant Case also asked defendant about a $400 withdrawal from Michael Witkowski's bank account. Defendant stated that she spent $340.26 for a class ring for Witkowski, but Sergeant Case testified that it was unclear where the remaining $60 went. When asked about the missing money from several of her wards' accounts, defendant stated that the money had been in the bank bag that was stolen. Sergeant Case testified that "it seems like whenever I talk to her and she can't explain something, it's [in] the bank bag."

In total, Sergeant Case found that the following amounts were missing from each ward: $2,140 from Pipher; $3,402 from Witkowski; $1,527 from Stamp; $252 from Sanders; $2,170 from Sultz; $1,586 from Bailey; $3,940 from Kaszubowski; $735 from Vanas; $3,323 from Wirt; and $2,334 from Urban. Sergeant Case stated that her investigation began on April 19, 2019, and defendant was arrested on November 12, 2020. Sergeant Case testified that she decided to charge defendant because, despite her best efforts, she could not locate the missing funds.

Julie Warthman, a certified public accountant, was qualified at trial as an expert in accounting and tracing. Warthman testified that she analyzed bank records for all of defendant's wards during their guardianship periods. She created spreadsheets tracking deposits, withdrawals, confirmed expenses, and unaccounted funds. Warthman testified that defendant's banking practices made tracing funds extremely difficult, as money was moved between accounts with no documentation showing which expenses were for which ward. Warthman explained:

[In] June of 2018, [defendant]'s savings account started to be used to pay expenses. So what would happen is money would be taken out of one of the 11 individuals bank accounts, withdrawn or direct transferred into the savings account and then expenses would be paid out of the savings account. The difficulty was that you could not—if $900.00 dollars was withdrawn from person A's account, you couldn't trace to the savings account from person A to the savings account because you would—the deposit amount would be person A, B, C, D, maybe. I tried in various ways to trace withdrawals from individual accounts into deposits into the shared account, sorry, the savings account. And it—I couldn't do it. Because the withdrawals from the individual accounts were completely different amounts than what ended up in the savings account. And then the bills that were coming out of the savings account were either money order or cashier's check or cash withdrawals. There was no documentation that this amount that was taken out of the savings account was for this individual or that individual. And then there were transfers in and out for some of the individuals coming into that savings account. And then there were transfers from the savings account to the individual checking account and that's where some of the bills may have been paid. But, again, . . . it's just showing up without any additional documentation.

Ultimately, Warthman determined that approximately $24,025 was missing across all wards. Warthman described defendant's accounting method as chaotic and potentially designed to deceive, noting patterns of round dollar amounts being withdrawn without corresponding documentation for expenses.

Defense counsel called one witness for the defense, Thomas Williams, a licensed professional investigator with expertise in fraud and financial investigations. Williams was qualified as an expert in financial investigations. Williams criticized the police investigation as incomplete, stating it relied too heavily on bank statements without obtaining supporting documentation like deposit tickets, cancelled checks, credit card statements, and receipts. He emphasized that proper financial investigation requires extensive footwork to trace transactions. Williams stated that investigators should have examined records before and after the guardianship period to establish a pattern in the funds being withdrawn. He also recommended reconstructing missing receipts by checking AFC home records for resident outings and matching them with transactions, as well as approaching retail establishments to verify transactions. Williams additionally found Warthman's analysis to be professional but incomplete, noting that it was in turn based on the police's incomplete investigation.

The defense rested after Williams's testimony. The jury deliberated the following day and found defendant guilty on all charges. Defendant was later sentenced as earlier described. This appeal followed.

## II. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that insufficient evidence was presented to find her guilty of the 11 crimes of which she was convicted. We disagree.

This Court reviews challenges to the sufficiency of the evidence de novo. *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). This Court also reviews "the evidence in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *Id*. (quotation marks and citations omitted). "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). "The prosecution need not negate every reasonable theory of innocence; it need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant." *People v Kenny*, 332 Mich App 394, 403; 956 NW2d 562 (2020). Circumstantial evidence may be used to sustain a conviction. *People v Xun Wang*, 505 Mich 239, 251; 952 NW2d 334 (2020). In those instances, the evidence "must facilitate reasonable inferences of causation, not mere speculation." *Id*. (quotation marks and citation omitted).

Defendant's challenge to the sufficiency of the evidence for her conviction of commingling of funds by a caregiver, MCL 750.145p, also implicates matters of statutory interpretation. This Court reviews such matters de novo. *People v Johnson*, 336 Mich App 688, 692; 971 NW2d 692 (2021).

## 1. MCL 750.175a

Defendant was convicted of eight counts of embezzlement of $1,000 to $20,000, MCL 750.174a(4)(a); one count of embezzlement of less than $200, MCL 750.174a(2); one count of embezzlement of $200 to $1,000, MCL 750.174a(3)(a); and one count of commingling of funds by a caregiver, MCL 750.145p(1). We will first address defendant's ten embezzlement convictions. MCL 750.174a states, in relevant part:

(1) A person shall not through fraud, deceit, misrepresentation, coercion, or unjust enrichment obtain or use or attempt to obtain or use a vulnerable adult's money or property to directly or indirectly benefit that person knowing or having reason to know the vulnerable adult is a vulnerable adult.

(2) If the money or property used or obtained, or attempted to be used or obtained, has a value of less than $200.00, the person is guilty of a misdemeanor punishable by imprisonment for not more than 93 days or a fine of not more than $500.00 or 3 times the value of the money or property used or obtained or attempted to be used or obtained, whichever is greater, or both imprisonment and a fine.

(3) If any of the following apply, the person is guilty of a misdemeanor punishable by imprisonment for not more than 1 year or a fine of not more than $2,000.00 or 3 times the value of the money or property used or obtained or attempted to be used or obtained, whichever is greater, or both imprisonment and a fine:

(a) The money or property used or obtained, or attempted to be used or obtained, has a value of $200.00 or more but less than $1,000.00.

* * *

(4) If any of the following apply, the person is guilty of a felony punishable by imprisonment for not more than 5 years or a fine of not more than $10,000.00 or 3 times the value of the money or property used or obtained or attempted to be used or obtained, whichever is greater, or both imprisonment and a fine:

(a) The money or property used or obtained, or attempted to be used or obtained, has a value of $1,000.00 or more but less than $20,000.00. [MCL 750.174a(1), (2), (3)(a), and (4)(a).]

Counts 1 through 10 required the prosecution to show that each ward was a "vulnerable adult" and that defendant knew or had reason to know that each ward was a vulnerable adult. See MCL 750.174a(4)(a); MCL 750.174a(2); MCL 750.174a(3)(a). The Legislature has defined a vulnerable adult as an "individual age 18 or over who, because of age, developmental disability, mental illness, or physical disability requires supervision or personal care or lacks the personal and social skills required to live independently." MCL 750.145m(u)(i). Here, defense counsel stipulated that the "vulnerable adult" element had been met for all 10 wards. Defendant does not challenge or seek to withdraw that stipulation on appeal.

We thus turn to whether the prosecutor established that defendant embezzled the amounts stipulated in MCL 750.174. Regarding Counts 1 through 8, the prosecutor had to prove that defendant embezzled "$1,000 or more but less than $20,000." MCL 750.174a(1) and (4)(a). For Count 9, the prosecutor had to prove that defendant embezzled "less than $200.00." MCL 750.174a(2). For Count 10, the prosecutor had to prove that defendant embezzled "$200.00 or more but less than $1,000.00." MCL 750.174a(3)(a).

Sergeant Case testified that the following amounts were missing from the wards: $2,140 from Pipher; $3,402 from Witkowski; $1,527 from Stamp; $252 from Sanders; $2,170 from Sultz; $1,586 from Bailey; $3,940 from Kaszubowski; $735 from Vanas; $3,323 from Wirt; and $2,334 from Urban. By Warthman's calculations, the following amounts were missing: $1,577 from Pipher; $3,309 from Witkowski; $1,528 from Stamp; $132 from Sanders; $3,008 from Sultz; $1,300 from Bailey, $5,666 from Kaszubowski; $2,650 from Vanas, $3,279 from Wirt; and $2,334 from Urban. Warthman placed the comparison in a chart:

| Client | State Police | Warthman | Difference |
|---|---|---|---|
| Pipher | $ 2,312.58 | $1,577 | $ 735.75 |
| Witkowski | $ 3,402.57 | $3,309 | $ 94.05 |
| Bailey | $ 1,586.00 | $1,300 | $ 286.00 |
| Kaszubowski | $ 3,940.02 | $5,666 | $ (1,726.00) |
| Sanders | $ 252.00 | $132 | $ 120.50 |
| Stamp | $ 1,527.63 | $1,528 | $ - |
| Sultz | $ 2,170.32 | $3,008 | $ (838.04) |
| Urban | $ 2,334.00 | $2,334 | $ - |
| Vanas * | $ 735.02 | $2,650 | $ (1,915.26) |
| Wayman | $ (771.00) | ($757) | $ (13.88) |
| Wirt | $ 3,348.63 | $3,279 | $ 69.92 |
| Total | $ 20,837.77 | $ 24,024.73 | $ (3,186.96) |

RECEIVED by MCOA 3/21/2025 2:4:

After Warthman's testimony, the prosecutor agreed to amend Count 9, pertaining to Yolanda Sanders, to embezzlement of less than $200. Warthman explained that any variation in the calculations was a result of her giving defendant "the benefit of the doubt." The prosecution additionally presented extensive documentation in support of the testimony regarding the calculation of funds missing from each ward, including bank statements, spreadsheets, and other documentary evidence, along with a video of defendant's police interview. Despite the discrepancies, the sum total of the evidence and testimony presented by the prosecutor at trial was sufficient to support the jury's conclusion that defendant embezzled funds from the wards within the applicable statutory ranges for Counts 1 through 10.

Defendant additionally argues that the prosecution failed to show that she used "fraud, deceit, misrepresentation, coercion, or unjust enrichment" to embezzle funds from the wards for her own benefit. MCL 750.174a(1). She instead states that the missing money in this case was merely the result of "sloppy bookkeeping and perhaps ignorance on the part of a first time guardian who had received no training on how to keep records."

Defendant is correct that, in general, embezzlement is a specific-intent crime. See *People v Douglass*, 293 Mich 388, 391; 292 NW 341 (1940). The prosecution theorized that defendant used a scheme of concealment to hide her unjust enrichment at the expense of her wards. Unjust enrichment is generally understood as an equitable doctrine under which a person retains money or benefits that belong to another. *AFT Mich, Inc v Michigan*, 303 Mich App 651, 660-661; 846 NW2d 583 (2014). To establish a claim of unjust enrichment, it must be shown that the defendant received a benefit from the plaintiff and that retaining this benefit would result in an inequity to the plaintiff. *Id*. at 661.

The prosecution had to prove that defendant intended to embezzle money, did so through a scheme of unjust enrichment, and retained the money for her own benefit. "An actor's intent may be inferred from all of the facts and circumstances, . . . and because of the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient." *People v Fetterley*, 229 Mich App 511, 517-518; 583 NW2d 199 (1998) (citations omitted). Additionally,

the prosecution is not required to "negate every reasonable theory of innocence, but must only prove its own theory beyond a reasonable doubt in the face of whatever contradictory evidence is presented." *Id*. at 517. Again, the prosecution's theory was one of unjust enrichment in this case; thus, the prosecution only had to prove that element of MCL 750.175a(1).

Here, extensive evidence indicated that defendant took money from the wards' bank accounts and placed it in her own personal account. She failed to keep adequate records of payments made on her wards' behalf. She failed to retain receipts, and she frequently used cashier's checks or cash to pay for items for her wards. She also claimed that a vast majority of the documentation for her wards was all kept in a bank bag, along with $3,000 of Witkowski's money, but that the bank bag had been stolen. Defendant further claimed that most of her records were kept in Indiana, but never provided access to those records, even when asked directly by APS Agent Hockanson. The evidence additionally suggested that, despite depositing the money into her own personal bank account, defendant was not using it to pay for her wards' necessities, including pharmacy bills, clothing, monthly allowances, rent payments, medical bills, and other items.

Defendant's behavior and failure to comply with the requirements for service as a guardian and conservator ultimately led to her removal as guardian for all of the wards in this case. There also remains the issue of defendant taking and retaining Pipher's car for her own use, placing her name on the title, and stating that she paid Pipher $600 for it, when she in fact did not. The car was ultimately removed from defendant's possession by Judge Nellis, who testified that he had his court staff take the car from her. The car was clearly being used for defendant's personal benefit— before it was sold, it had to be cleaned, because it had been used to transport animals and children.

The prosecutor established beyond a reasonable doubt that Defendant knowingly and deliberately embezzled funds from the wards. The proofs revealed that defendant used a scheme to unjustly enrich herself and that she inappropriately pocketed the wards' nominal accounts for her own benefit. The evidence included defendant's mismanagement of each of her wards' funds; defendant's inconsistent statements regarding amounts of money taken from the wards and the uses to which she purportedly expended the wards' money; defendant's refusal or failure to produce records and receipts that could have supported her version of events; and defendant's unauthorized use of Pipher's car for personal business. Based on this overwhelming evidence, a reasonable jury could conclude that defendant was guilty of the charged crimes. *Ericksen*, 288 Mich App at 195. Defendant's argument to the contrary lacks merit.

2. MCL 750.145p(1)

Defendant also challenges the sufficiency of the evidence presented to support her conviction of commingling of funds by a caregiver, MCL 750.145p(1). That statute provides, in relevant part:

> (1) A caregiver, other person with authority over a vulnerable adult, or a licensee who intentionally does 1 or more of the following is guilty of a misdemeanor punishable by imprisonment for not more than 2 years or a fine of not more than $25,000.00, or both:

(a) Commingles, borrows, or pledges funds of a resident that are required by law or administrative rule to be held in a separate trust account. [MCL 750.145p(1)(a).]

Defendant contends that the prosecution had to prove that (1) she intended to commingle her funds with the wards' funds, and (2) she was legally required to hold the funds "in a separate trust account," MCL 750.145p(1)(a). Ample evidence exists to prove the first element; defendant herself admitted to APS Agent Hockanson that she placed the wards' funds in her personal account. Additional testimony clearly indicated that this practice was forbidden; several witnesses testified that they knew not mix client funds with personal funds.

The question then becomes whether the prosecution established that defendant was legally obligated to keep client funds in a separate trust account. This involves a question of statutory interpretation, rather than a pure sufficiency-of-the-evidence issue. The goal of statutory interpretation "is to ascertain and give effect to the intent of the Legislature. The touchstone of legislative intent is the statute's language." *People v Harris*, 495 Mich 120, 126-127; 845 NW2d 477 (2014) (quotation marks and citation omitted). If a statute's language is clear and unambiguous, this Court must enforce the plain meaning of the statute as written. *Id*.

Defendant does not advance any argument that she was not the wards' "caregiver," or that the wards were not "vulnerable adults" within the meaning of the statute, see MCL 750.145m. Defendant's sole argument is that the prosecution cannot establish that she was legally required to keep client funds in a separate trust account. The prosecution responds that, under EPIC, MCL 700.1101 *et seq*., guardians and conservators are considered "fiduciaries." MCL 700.1104(e). Under MCL 700.1212(1), fiduciaries must ensure the "segregation of assets held in the fiduciary capacity." This requirement means that a fiduciary must keep the assets they manage on behalf of heirs, devisees, beneficiaries, protected individuals, or wards separate from their own personal assets. This duty is part of the guardian or conservator's broader fiduciary obligations, which include undivided loyalty, impartiality, care, and prudence in managing the assets. MCL 700.1212(1). Caselaw further illustrates the importance of this duty. For example, in *In re Conservatorship of Murray*, 336 Mich App 234, 259-260; 970 NW2d 372 (2021), the respondent fiduciary was found to have breached his duty under MCL 700.1212 by "commingl[ing] [the deceased]'s bank account funds by depositing them into his own bank account." This Court determined that the respondent's actions constituted a failure to segregate the assets as required by law. *Id*. at 260.

Based on this framework, the key question is whether the requirement that a fiduciary "segregate[e] . . . assets held in the fiduciary capacity," MCL 700.1212(1), constitutes a "law or administrative rule" requiring funds to be "held in a separate trust account" under MCL 750.145p(1)(a). While MCL 700.1212 does not use the phrase "trust account," the requirement to segregate assets is generally understood to mean that funds must be held in a separate account, often referred to as a trust account. Accordingly, we find that MCL 700.1212(1) does require guardians to avoid commingling funds, and that the failure to do so can result in criminal penalties under MCL 750.145p(1)(a). In other words, defendant, in her capacity as a guardian and/or conservator, had a legal duty to keep funds in separate accounts, per

MCL 700.1212(1). Her actions in mixing the wards' funds in her own personal account[1] thus constituted commingling of funds legally required to be maintained in a separate account within the meaning of MCL 750.145p(1)(a). Consequently, sufficient evidence was presented to support her conviction of commingling funds under MCL 750.145p(1)(a).

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that her defense counsel was constitutionally deficient for 1) failing to call witnesses in her defense and 2) failing to request jury instructions on the necessarily included lesser offense of embezzlement of $200 to $1,000, MCL 750.174a(3)(a), for Counts 1 through 8, and embezzlement of less than $200, MCL 750.174a(2), for Count 10. We disagree.

"Ordinarily, whether a defendant has been denied effective assistance of counsel is a mixed question of fact and law—the trial court's factual findings supporting its decision are reviewed for clear error, while the court's determination of whether those facts violated the defendant's right to the effective assistance of counsel is reviewed de novo." *People v Wade*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 369106); slip op at 12 (quotation marks and citation omitted). Defendant moved for a *Ginther* hearing, but the motion was denied. Thus, while the matter is preserved, "there are no factual findings to which this Court must defer, and our review is limited to errors apparent on the record." *Id.* (quotation marks and citation omitted).

A defendant who seeks to establish a claim of ineffective assistance of counsel must show "that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). Counsel is presumed to be effective and defendant bears the burden of proving otherwise. *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021). Defendant likewise bears the burden to establish the factual predicate for the claim. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999).

## 1. FAILURE TO CALL WITNESSES

Defendant first argues that defense counsel was ineffective for failing to call additional witnesses. Defendant claims that additional witnesses could have testified that she cared for her wards and explain why certain purchases were not accounted for in the wards' financial records. On appeal, defendant presents no evidence that these purported witnesses were able to testify at trial, nor has she provided this Court with any offer of proof, such as an affidavit, to support that the witnesses would have testified in her favor.[2] "Without some indication that a witness would have testified favorably, a defendant cannot establish that counsel's failure to call the witness

---

[1] The account at issue was one defendant shared with her mother, all the more inappropriate.

[2] In her appellate brief, defendant directs the panel to a number of appendices, including her own sworn affidavit. Defendant relied on the same affidavit in support of her motion to remand for a *Ginther* hearing. However, the affidavit has never been submitted to this Court, either as an attachment to her motion to remand or as an appendix to her brief on appeal, nor is it available in the lower court record.

-12-

would have affected the outcome of his or her trial." *Wade*, ___ Mich App at ___; slip op at 13 (quotation marks and citation omitted).

## 2. JURY INSTRUCTIONS

Defendant also argues that defense counsel was ineffective for failing to request jury instructions on the lesser included offenses of embezzlement of $200 to $1,000 in relation to Counts 1 through 8, and embezzlement of less than $200 in relation to Count 10. Defendant is correct that these are lesser included offenses of the greater offenses of embezzlement of $1,000 to $20,000 and embezzlement of $200 to $1,000, respectively. See *People v Golden*, 121 Mich App 490, 328 NW2d 667 (1982) ("Embezzlement of under $100 is a necessarily lesser included offense of embezzlement of over $100, as it is impossible to commit the greater offense without first having committed the lesser offense.").

Defense counsel's trial theory in this matter was that defendant was not stealing from the wards. Throughout defense counsel's closing arguments, she suggested that defendant was completely innocent. Thus, rather than pursuing a theory of partial culpability, defense counsel presented the argument that Ms. Englebrecht did not commit embezzlement at all. Had defense counsel instead fought for jury instructions regarding lesser included offenses, she may have undermined her own trial strategy and reduced the chances of an acquittal. See *People v Smith*, 336 Mich App 79, 104; 969 NW2d 548 (2021) (stating that defense counsel's failure to request a lesser-included jury instruction for assault with intent to do great bodily harm was a reasonable trial strategy where the defense's theory of the case was that the defendant was innocent of the charged crime); *People v Allen*, 331 Mich App 587, 610-611; 953 NW2d 460 (2020), vacated in part on other grounds 507 Mich 856 (2021) (recognizing that declining to request a lesser offense instruction could be a legitimate trial strategy, particularly when pursuing an "all-or-nothing" defense aimed at securing an acquittal). That this strategy "ultimately failed does not constitute ineffective assistance of counsel." *People v Kevorkian*, 248 Mich App 373, 414-415; 639 NW2d 291 (2001). "We will not substitute our judgment for that of counsel on matters of trial strategy, nor will we use the benefit of hindsight when assessing counsel's competence." *People v Unger*, 278 Mich App 210, 242-243; 749 NW2d 272 (2008). Defendant's argument therefore lacks merit.

## C. MRE 803(6)

Finally, defendant argues that the trial court abused its discretion by allowing the prosecution to introduce business records under MRE 803(6). We disagree.

This Court reviews arguments regarding the admissibility of evidence for an abuse of discretion. *Id*. at 216. "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Id*. at 217. This Court reviews de novo preliminary questions of law, including "whether a rule of evidence precludes admissibility." *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014).

Hearsay is a statement other than one made by the declarant while testifying at the hearing that is offered to prove the truth of the matter asserted. MRE 801(c). Hearsay is generally inadmissible, with certain exceptions. MRE 802. The hearsay exception at issue here is MRE 803(6), which provides:

A memorandum, report, record, or data compilation, in any form, of acts, transactions, occurrences, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with a rule promulgated by the supreme court or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit. [MRE 803(6).]

In *People v Vargo*, 139 Mich App 573, 580; 362 NW2d 840 (1984), this Court further explained that, to lay a proper foundation for the admission of business records using the testimony of a qualified witness, the party seeking their admission must present a witness with "[k]nowledge of the business involved and its regular practices[.]" Additionally, in *People v Safiedine*, 152 Mich App 208, 217; 394 NW2d 22 (1986), this Court held that these foundational requirements do not require the party seeking admission to produce the author of the records or even a person who can interpret the content of the records. Instead, the qualified witness need only show that "the records were made in the ordinary course of business . . . and were made at or near the times of the transactions." *Id*. at 216.

At trial, Kenneth Meyers testified that he was the husband of Sue Meyers, who ran Krystal Manor AFC, where several of the wards lived. He stated that Sue was unable to testify at trial because she had a stroke that caused memory, mobility, and speech issues. Kenneth stated that he helped with minor tasks at the AFC and was very familiar with Sue's business practices. He testified that he saw Sue write down numbers on documents pertaining to the wards living at the AFC and knew the residents to whom the records corresponded. Kenneth additionally asserted that he had been married to Sue for 50 years and was very familiar with her handwriting. He supported his testimony by identifying Sue's handwriting on the business records that the prosecution sought to admit. Kenneth additionally stated that the records were made in the ordinary course of Sue's business and identified the tablet that she would use to keep the records. He stated that he "wasn't [at the AFC] every 24 hours," but agreed that Sue made the records "daily" for residents.

On this record, we conclude that the prosecution laid a sufficient foundation for admitting the business records under MRE 803(6). While Kenneth was not intimately familiar with the business end of running the AFC, he was able to identify what the records were, why they were kept, and when they were created. He also verified that Sue created the records and that it was her handwriting on them. Thus, the prosecution presented sufficient evidence to show that the records were trustworthy, "were made in the ordinary course of business . . . and were made at or near the times of the transactions." *Id*. at 216. Defendant is not entitled to relief on this basis.

Even if we were to agree that the trial court abused its discretion in this instance, any alleged error in the admission of the evidence was harmless. "Under the harmless-error rule set forth in MCL 769.26, it is presumed that preserved, nonconstitutional error—such as evidentiary

error—is harmless, and to overcome that presumption the appellant bears the burden of demonstrating, on the strength of the entire record, 'that it is more probable than not that the error was outcome determinative.' " *People v Propp (On Remand)*, 340 Mich App 652, 661-662; 987 NW2d 888 (2022), quoting *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999); see also *People v Gursky*, 486 Mich 596, 619; 768 NW2d 579 (2010) ("[T]he admission of a hearsay statement that is cumulative to in-court testimony by the declarant can be harmless error, particularly when corroborated by other evidence."). The sheer volume of evidence presented by the prosecution suggests that the outcome of the case would not have been different even if the evidence had been excluded. See *Lukity*, 460 Mich at 495 ("The object of this inquiry is to determine if it affirmatively appears that the error asserted undermines the reliability of the verdict. In other words, the effect of the error is evaluated by assessing it in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error.") (quotation marks, citation, and brackets omitted). Defendant's claim thus fails.

Affirmed.

/s/ Michelle M. Rick
/s/ Colleen A. O'Brien
/s/ Allie Greenleaf Maldonado